**STATE v. GREIME**

[97 N.C. App. 409 (1990)]

STATE OF NORTH CAROLINA v. WILLIAM "BILLY" GREIME

No. 8929SC326

(Filed 20 February 1990)

1. **Criminal Law § 51 (NCI3d) — fire department lieutenant — expert opinion testimony**

     Though it would have been the better practice for the state to have tendered a fire department lieutenant as an expert, any error in permitting the witness to state opinions as an expert was harmless where the witness testified that he had attended three arson schools and had investigated a number of suspicious fires in the past, and the trial court implicitly found him to be an expert.

     **Am Jur 2d, Arson and Related Offenses § 49.**

2. **Criminal Law § 75.10 (NCI3d) — defendant's statement during interrogation — waiver of constitutional rights**

     The trial court did not err in admitting into evidence defendant's statement made during custodial interrogation that "he couldn't say that he did do the break-in and the arson or that he didn't," since evidence supported the trial court's finding that defendant knowingly and intelligently waived his rights, and the interrogating officer honored the limits which defendant had placed on his waiver of counsel.

     **Am Jur 2d, Evidence §§ 555, 556, 557.**

3. **Criminal Law § 1079 (NCI4th) — sentence — finding that aggravating factors outweighed mitigating factors**

     The trial court did not err in finding that aggravating circumstances outweighed mitigating circumstances and in ordering defendant's imprisonment for a term exceeding the presumptive sentence.

     **Am Jur 2d, Criminal Law §§ 598, 599.**

APPEAL by defendant from Judgment of *Judge Bruce Briggs* entered 10 November 1988 in HENDERSON County Superior Court. Heard in the Court of Appeals 21 September 1989.

*Attorney General Lacy H. Thornburg, by Associate Attorney General Cheryl D. Jackson, for the State.*

*J. Michael Edney for defendant appellant.*

COZORT, Judge.

The defendant was convicted of burning a building used for trade and sentenced to ten years in prison. On appeal, he contends that the trial court erred in three respects: first, by allowing a lay witness to testify as an expert; next, by refusing to suppress defendant's inculpatory statement regarding the fire; and, lastly, in finding that aggravating circumstances outweighed mitigating circumstances and ordering defendant's imprisonment for a term exceeding the presumptive sentence. We find no prejudicial error.

The State offered evidence tending to show that on the night of 2-3 July 1988, the Hendersonville Police and Fire Departments responded to Mr. Greime's report of a fire at Yung's Wig Shop. Andre Massey, the first police officer to reach the shop, testified that he found a kerosene can "just inside the door and then about eight or ten feet up." Police Captain John Nicholson testified that, in his opinion, the back door had been forced open from the inside. Further investigation revealed a common attic or crawlspace above the ceilings of Yung's Wig Shop and the adjacent Lawn Mower Shop operated by defendant. The State's evidence also tended to show the following: a piece of cord, like the "pull cord" used by defendant to repair lawn mowers and chain saws, was attached to a piece of tin ceiling tile above the wig shop; there were footprints in the dust above the ceiling; and, "smushed into the tin [ceiling tile] . . . was a Marlboro cigarette butt," the same brand of cigarette that defendant smoked.

On 15 July 1988, Mr. Greime called the Hendersonville Police Department and was told that the police would seek warrants charging him with felony breaking and entering, larceny, and burning a building used for trade. Later that day, when he voluntarily surrendered, he was charged with those offenses. At approximately 10:15 p.m. that night, Captain Nicholson interrogated Mr. Greime.

Over Mr. Greime's objection the trial court permitted Lieutenant Philip Cagle of the Hendersonville Fire Department to testify as an expert on a number of points, including the "odor of a flammable liquid" in Yung's Wig Shop. The trial court permitted Cap-

tain Nicholson of the Police Department to testify, also over objection, that during custodial interrogation the defendant said: "he couldn't say that he did do the break-in and the arson or that he didn't."

[1]  The defendant contends that Lieutenant Cagle, who was neither tendered as nor expressly found to be an expert in investigating arson or other fires, was a lay witness, qualified to offer only "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (1989). Thus, defendant argues that the trial court erroneously allowed Lieutenant Cagle to offer expert testimony on the following: whether he detected the odor of kerosene; whether he conducted an arson investigation; the characteristics of a kerosene fire; and how long the fire burned.

When the defendant objected to testimony from the witness on the grounds that he was not an expert, the trial court overruled the objection. The court's ruling came at the end of this exchange:

> Q   Did you smell anything that smelled like kerosene—
>
> MR. CARPENTER: Objection.
>
> THE COURT: Overruled.
>
> Q   Have you ever smelled kerosene before?
>
> A   Yes, sir.
>
> Q   You know what kerosene smells like?
>
> A   Yes, sir.
>
> * * * *
>
> Q   Now, have you had any experience in arson training or—
>
> A   Yes, sir, I have.
>
> Q   —or training to investigate arson cases?
>
> A   Well, I have been to two that I can recall and approximately three arson schools over the years.
>
> Q   Okay. In your arson training did you receive any certificates for attending these schools?

A   Yes, sir.

Q   As a matter of course in your occupation as a Lieutenant with the Fire Department did you routinely investigate cases looking for possible arson?

A   Most all our fires that are, you know, fairly suspicious, then we do some kind of investigation. For a period of time we did our own, but the Police Department has taken care of that for the last several years, however.

*  *  *  *

Q   Okay, I'll ask you if you did such an investigation at the scene of this gift shop fire as to looking for signs or indications of possible arson?

A   Oh, yes, sir.

MR. CARPENTER: Objection.

THE COURT: Overruled.

*  *  *  *

Q   Did you examine the carpet area there where the burning had occurred?

A   Yes, sir, we did.

Q   Did you notice anything unusual about that area?

A   The odor of a flammable liquid. I could not determine the exact liquid other than I could absolutely swear that it was kerosene or a Varsol, something other than gasoline. We did not have the flash area that would be involved with gasoline or lacquer thinner. That probably would have exploded rather than setting [sic] there and smoldering as long as it did.

Q   When you burn kerosene, in your experience, what effect does that have in one local area like that?

MR. CARPENTER: Objection, no foundation.

THE COURT: Overruled.

A   Usually the kerosene itself will burn after it gets started and it will actually burn itself before the material that it is on will ignite. After the kerosene itself burns then the material will get involved. So it acts almost like a wick, almost like a wick would.

Q    Comparing that with your experience with the way kerosene burns, on the physical evidence you saw there at that six by six foot spot, compare that with what you saw as to what you just testified as to the way kerosene burns?

> MR. CARPENTER: Objection, if your Honor please, he has not been qualified as an expert witness, I don't believe.

THE COURT: Overruled.

Taking these rulings in context, we hold that the trial court implicitly found Lieutenant Cagle to be an expert. The record would support such a finding, and the "opinion of an expert witness is admissible when it is shown that the witness, through study or experience, has acquired such skill and expertise that he is better qualified than the jury to form an opinion on the subject matter to which his testimony applies." *State v. Monk*, 291 N.C. 37, 52, 229 S.E.2d 163, 173 (1976). While "it would have been better practice for the [State] to have tendered" Lieutenant Cagle as an expert, in the circumstances disclosed by the record, any error in permitting the witness to state opinions as an expert was harmless. *State v. Perry*, 275 N.C. 565, 572, 169 S.E.2d 839, 844 (1969); *see also State v. Jenerett*, 281 N.C. 81, 90, 187 S.E.2d 735, 741 (1972), and *State v. Cates*, 293 N.C. 462, 471-72, 238 S.E.2d 467, 472 (1977).

[2]    The defendant contends next that the trial court erred by refusing to suppress his inculpatory statement. Mr. Greime argues that during custodial interrogation he expressed the desire to deal with the police only through counsel. A defendant in those circumstances is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Mr. Greime maintains that Captain Nicholson impermissibly continued the interrogation, and Mr. Greime eventually said "he couldn't say that he did do the break-in and arson or that he didn't."

After voir dire examination the trial court overruled Mr. Greime's motion to suppress his statement and permitted Captain Nicholson to testify as follows:

Q    State to the members of the jury whether or not you advised him of his Constitutional Rights?

A    Yes, I did.

Q  In that regard, what rights did you advise him of and what was his response?

A  I first advised him since he was in custody at the jail charged with breaking, entering, larceny and arson, that I was going to advise him of his rights, and I proceeded to do so.

I said, "You have the right to remain silent." Then I asked him if he understood that.

Mr. Grieme said, "Yeah."

Then I stated, "Anything you say can be used against you in a court of law." And then I asked him if he understood that and Mr. Grieme said, "Yes, sir."

Then I said, "You have the right to talk to a lawyer, to have a lawyer present while you are being questioned. Do you understand that?" Mr. Grieme said, "Yes, sir."

"If you want a lawyer before or during questioning, but cannot afford to hire one, one will be appointed to represent you at no cost before any questioning. Do you understand that?"

Mr. Grieme said, "Yes, I do."

"If you answer questions now without a lawyer here, you still have the right to stop answering questions at any time. Do you understand that?"

Mr. Grieme: "Yes, I do."

"Do you understand each of the rights that I have just explained to you?

Mr. Grieme: "Yes, I do."

*"Having these rights in mind, do you wish to answer questions?"*

*Mr. Grieme: "Yes, okay."*

*"You now wish to answer questions now without a lawyer present?"*

*Mr. Grieme: "No."*

"Do you have an attorney?"

Mr. Grieme: "Yes, I do."

"Who is your attorney?"

Mr. Grieme: "Youngblood."

"And you don't want to answer questions at all?"

Mr. Grieme: "He advises me not to say anything, but I don't know what you would be asking, so—"

At that time I said, "Huh?" I didn't really understand what his response was.

Mr. Grieme then stated, "I don't know what you would be asking me."

*So he stated, "I could stop at any time, correct." That was his question to me.*

*Then I stated, "Right."*

*Mr. Grieme: "Okay. I will go ahead and answer any questions you need to, but if you want to stop—excuse me—if I want to stop, I just stop, okay?"*

*And to him I replied, "Okay, but you don't have to without your attorney being present."*

Mr. Grieme: "I understand that, he advised me not to say anything, really, that is what he told me."

At that time I asked Mr. Grieme, "Well, what do you want to do?"

And at that time Mr. Grieme said, "Talk about it, but I will stop if I feel—" Then he asked for a pen so he could sign the waiver of rights.

\* \* \* \*

Q   Now, Officer Nicholson, later in the interview did Mr. Grieme—Did you have a tape recorder?

A   Yes, sir, I did.

Q   Did Mr. Grime ask you to shut the tape recorder off?

A   Yes, sir, he did.

Q   What point did he do that?

A   Okay. I had talked to him about some of the inconsistencies in the evidence that I was trying to send off to

the lab. Mr. Grime at that time said, "Will you shut that off a minute?"

*At that time, at his request, I turned off the tape recorder. And he stated that he could not talk with one of those things and that he couldn't say that he did do the break-in and the arson or that he didn't.* He said that he had been under a lot of stress and a lot of pressure and when he is under a lot of stress pressure he doesn't know what he does, he kind of like blacks out and couldn't remember things. He didn't know if he did or didn't.

At that time he started to cry.

I didn't question him or push him at that time. I waited for a minute or two for him to get his composure back. *Before I could ask another question, he stated that he didn't want to answer any more questions and requested his attorney.*

Q  Did you then terminate your interview?

A  Yes, sir, I did. [Emphasis added.]

The admissibility of Mr. Greime's statement is controlled by *Smith v. Illinois*, 469 U.S. 91 (1984). In *Smith* the Supreme Court held:

Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries . . . .

\* \* \* \*

Our decision is a narrow one. We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself nor do we decide the consequences of such ambiguity or equivocation. We hold only that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

*Id.* at 98-100. Thus, when Captain Nicholson asked, "You now wish to answer questions now [*sic*] without a lawyer present?" and Mr. Greime replied, "No," his subsequent statements became relevant only to the issue of waiver.

Mr. Greime's subsequent statements are susceptible to differing interpretations. After voir dire examination and arguments from counsel, the trial court found

> that from a totality of the circumstances the defendant knowing that he had a right to remain silent, and he had a right to counsel, and that he in fact conferred with counsel, and had in fact been advised by counsel to say nothing; [*sic*] initiated further conversation with the investigating officer and in doing so voluntarily, knowingly, and intelligently waived the rights which he had had explained to him and to each of which he had indicated that he understood.

Findings of fact "concerning the admissibility of a confession are conclusive and binding if supported by competent evidence. This is true even though the evidence is conflicting." *State v. Nations*, 319 N.C. 318, 325, 354 S.E.2d 510, 514 (1987) (citation omitted). The trial court's finding was supported by competent evidence, and we hold that Captain Nicholson honored the limits ("if I want to stop, I just stop, okay?") that Mr. Greime placed on his waiver of counsel. *See Patterson v. Illinois*, 108 S. Ct. 2389, 2395 n.5 (1988).

[3]  The defendant contends, lastly, that the sentencing procedure in the trial court was fatally flawed. Specifically, the defendant maintains that the trial court "did not consider and weigh all factors" in aggravation and mitigation as required by N.C. Gen. Stat. § 15A-1340.4.

The alleged factor to which defendant points, however, is one weighing in aggravation of his offense. During the sentencing hearing, the State offered evidence tending to show "damage causing great monetary loss." N.C. Gen. Stat. § 15A-1340.4(a)(1)(m). The trial court considered but did not find that factor. In aggravation it did find the defendant's seven prior convictions of offenses punishable by more than sixty days' confinement. In mitigation the court found that defendant suffered from a mental condition insufficient to constitute a defense but one that significantly reduced his culpability. After weighing these factors, the court sen-

tenced Mr. Greime to ten years for a Class E felony, which has a presumptive sentence of nine years.

A trial judge is required to consider all of the aggravating and mitigating factors listed in N.C. Gen. Stat. § 15A-1340.4 before imposing a sentence greater than the presumptive term, but "he is only required to set out in the judgment the factors that he determines by the preponderance of the evidence are present." *State v. Davis*, 58 N.C. App. 330, 334, 293 S.E.2d 658, 661, *disc. review denied*, 306 N.C. 745, 295 S.E.2d 482 (1982). In the sentencing hearing the defendant has shown neither abuse of discretion, nor procedural conduct operating to his prejudice, nor circumstances manifesting inherent unfairness. In the absence of those flaws in sentencing, a judgment will not be disturbed. *State v. Pope*, 257 N.C. 326, 335, 126 S.E.2d 126, 133 (1962).

No error.

Judges PHILLIPS and LEWIS concur.